1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                            )
IVAN VUJICEVIC,                             )        Case No. C13-0204RSL
                                            )
                          Petitioner,       )
            v.                              )
                                            )        MEMORANDUM OF DECISION
ADRIANA VUJICEVIC,                          )
                                            )
                          Respondent.       )
_____)

            This matter was heard by the Court commencing on May 28, 2013, and concluding

on May 30, 2013.  Ivan Vujicevic (hereinafter "father" or "Mr. Vujicevic") filed a petition

seeking the return of his child, E.V., to Croatia pursuant to the Hague Convention of Civil

Aspects of International Child Abduction ("the Convention) and the International Child

Abduction Remedies Act.

            The parties have stipulated to facts establishing a *prima facie* case of child

abduction under the Convention.  The Court therefore finds that petitioner Adriana Vargas

Vujicevic (hereinafter "mother" or "Ms. Vargas") wrongfully removed E.V. to the United States

in February 2012 in violation of Mr. Vujicevic's custody rights under the laws of Croatia.[1]  Once

---

    [1] Miro Vujicevic, E.V.'s older brother, also accompanied his mother to the United States.  Miro
was over the age of sixteen in February 2012, however, and is not therefore subject to return under the
Convention.

MEMORANDUM OF DECISION

1  wrongful removal is shown, the child must be returned to the country in which the child had

2  habitually resided before the removal unless the respondent can establish one of the exceptions

3  set forth in the Convention.  Ms. Vargas argues that two defenses apply in this case.  The first,

4  which must be proven by clear and convincing evidence, applies if the return of the child would

5  expose E.V. to a "grave risk of physical or psychological harm or otherwise place the child in an

6  intolerable situation."  Convention Article 13(b).  The second defense, which must be proven by

7  a preponderance of the evidence, gives the Court discretion to refuse to order the return of the

8  child "if it finds that the child objects to being returned and has attained an age and degree of

9  maturity at which it is appropriate to take account of [the child's] views."  Convention Article

10  13.

11  **FINDINGS OF FACT**

12           Mr. Vujicevic and Ms. Vargas had a relationship marked with acts of physical

13  violence and verbal abuse.  Disagreements regarding mundane matters would, with depressing

14  frequency, give rise to shouting matches and occasionally flare into physical violence.  Ms.

15  Vargas reports that, during the early years of their relationship, she was an active combatant in

16  these battles, but it soon became clear that physical altercations would never be decided in her

17  favor.  Ms. Vargas became adept at sensing when Mr. Vujicevic was approaching the line

18  between a shouting match and physical violence and would withdraw, leaving problems

19  unresolved and Mr. Vujicevic the dominant force in the house.  Their children, Miro and E.V.,

20  grew to hate the fights and realized that their mother always lost, regardless of the

21  reasonableness of her inquiry or argument.  Ms. Vargas, Miro, and E.V. came to feel that their

22  role in the household was to serve Mr. Vujicevic and that the failure to stop whatever they were

23  doing and immediately comply with his requests, no matter how small or seemingly

24  inconsequential, could spark a violent confrontation.

25           This general situation continued unabated and essentially unchanged from the mid-

26  1990's to June 2011.  At that point, E.V. was 12, and Miro had just turned 17.  E.V. was playing

MEMORANDUM OF DECISION                    -2-

a game on the computer when his father came home.  Mr. Vujicevic was in a hurry and asked E.V. to find an address for him.  As recounted by Ms. Vargas, the game E.V. was playing did not allow the player to save and stop at will, so he continued to play until he could save his progress.  When Ms. Vargas went to explain the delay to Mr. Vujicevic, he started cursing at her.  Miro came home to hear screams and shouting coming from his father's room.  He saw his father punch Ms. Vargas, saw Ms. Vargas back away, and heard his father cursing her as he pushed her out of the room.  Ms. Vargas realized that it was time to withdraw, but Miro was upset that Mr. Vujicevic had hit his mother.  For the first time, Ms. Vargas found that she was not able to control Miro:  despite telling him to let it go, Miro openly challenged Mr. Vujicevic.  Mr. Vujicevic spit on Miro and would have struck him if Ms. Vargas had not blocked the blow.  Once she had separated Miro from his father, Miro made it clear that he was not going to shy away from confrontation anymore and would fight his father if the need arose.  Ms. Vargas realized that she was going to have to leave Mr. Vujicevic or risk a violent confrontation between Miro and his father the next time his parents fought – as they undoubtedly would.

Ms. Vargas requested a divorce and began investigating her options for separating from Mr. Vujicevic.  She contacted a domestic violence hotline and discovered that her options were not particularly good.  Funding for indigent legal services was limited, and Ms. Vargas was told that she would likely have to wait a long time to process a divorce petition.  Local shelters for battered women would not accept Miro, who was over the age of 12, and Mr. Vujicevic's income was insufficient to support two households.  Because Ms. Vargas had no other housing options in Croatia that would allow her to stay with her two sons, she realized that they would have to continue living with Mr. Vujicevic during the pendency of the divorce proceedings.  The domestic violence advisors recommended that Ms. Vargas file a police report regarding the June 2011 event, which she did on July 15, 2011.  In the process, Ms. Vargas also revealed that Mr. Vujicevic had weapons in the house, mementoes of his days of fighting against Marshal Tito and Slobodan Milosevic on behalf of Croatia.  Possession of these weapons apparently ran afoul of

Croation law.  Mr. Vujicevic ultimately pled guilty to domestic violence and was later convicted on illegal weapons charges.  Both convictions resulted in suspended sentences, and, to Ms. Vargas' and Miro's surprise, Mr. Vujicevic returned to the house immediately thereafter.  The atmosphere in the house degenerated even further.  Mr. Vujicevic refused to talk to Ms. Vargas and wrote hateful letters excoriating her for a lack of loyalty.  Ms. Vargas and Miro began interpreting ambiguous conduct as threatening.  For example, when Mr. Vujicevic left his autobiography out for the boys to review, his family took it as a reminder that he had a colorful and violent past as a Freedom Fighter.  When he brought an antique sword into the house, they interpreted it as a statement that he would do as he pleased and would not be cowed by a weapons conviction.

In January 2012, E.V. was watching television and refused to give it up in the middle of a show so that his father could watch the news.  The disagreement escalated until Mr. Vujicevic pinched his son's nose between his knuckles and slapped him across the face.  E.V. threatened to report him to the police, but Ms. Vargas intervened, feeling that there was no point in making another report of domestic violence.

Given her limited options within Croatia, Ms. Vargas had been advised by the Americans Overseas Domestic Violence Crisis Center to contact the United States Embassy. She had contemplated leaving Croatia altogether and moving to the United States in the fall of 2011, but after the fight between E.V. and Mr. Vujicevic, Ms. Vargas took concrete steps to make that plan a reality.  E.V.'s United States passport had expired, however, and Ms. Vargas would have to prove "special circumstances" in order to obtain a passport without the consent of the father.  On February 7, 2012, Ms. Vargas submitted a "Statement of Special Circumstances" recounting twenty years of abuse at the hands of Mr. Vujicevic, the recent events involving the children, and the basis for her contention that Mr. Vujicevic would never give permission for E.V. to obtain a passport.  The Embassy provided a passport and, in February 2012, Ms. Vargas and her sons secretly left Croatia for the United States.

1    Petitioner argues that the "Statement of Special Circumstances" – and, for that
2   matter, the testimony presented in this case – are all part of a campaign to portray Mr. Vujicevic
3   as a dangerous individual in order to receive a passport and/or defend this action, with the
4   implication being that the portrayal is untrue.  Petitioner does not dispute that the events
5   recounted by Ms. Vargas occurred, however.  Rather, he relies primarily on the fact that Ms.
6   Vargas did not label her home situation as one involving domestic violence until after she
7   contacted the United States Embassy.  There is no indication that any of the episodes reported by
8   Ms. Vargas were falsified or exaggerated.  The change, if any occurred, appears to be one of
9   perspective.  Until June 2011, Ms. Vargas thought her life, while tumultuous, was fairly normal
10  and that when her husband was upset with her, it was her fault.  But when it became apparent
11  that Mr. Vujicevic was willing to strike the children, too, she realized  that the problem was not
12  necessarily her, but him.  After reaching out to the domestic violence advocates, Ms. Vargas
13  discovered that what she had been experiencing has a name:  domestic violence.  The Court
14  finds that the fact that Ms. Vargas thereafter described her past life using that term reflects her
15  more informed understanding of her situation rather than an attempt to create a false history.

16    Ms. Vargas and her sons spent a week with her family in New York City, then
17  moved into a shelter for abused women.  She knew that her husband was trying to contact her
18  and the boys, but she took steps to avoid detection, including relocating to Seattle when Mr.
19  Vujicevic filed a Hague Convention petition in the District Court for the Southern District of
20  New York.  Ms. Vargas, with the help of domestic violence advocates in New York and Seattle,
21  has done everything in her power to help the boys adjust to their new life in America.

22                              **CONCLUSIONS OF LAW**

23  **A.  GRAVE RISK OF HARM EXCEPTION**

24    Based on the foregoing facts, the Court finds that Ms. Vargas has failed to show by
25  clear and convincing evidence that returning E.V. to Croatia would expose him to a grave risk of
26  physical or psychological harm.  E.V. has an overall positive impression of Croatia, and there

MEMORANDUM OF DECISION                    -5-

are things about that country which he misses.  Mr. Vujicevic states that he is willing and able to provide a separate residence for E.V. and Ms. Vargas if they return to Croatia so that the courts of that country have an opportunity to make the custody determination.  Ms. Vargas herself indicated through both her words and actions that Mr. Vujicevic did not pose a grave threat to her children even after the domestic violence conviction:  she sent both of them on a trip to the Adriatic Coast with their father, and she assured Mr. Vujicevic that a separation or divorce would not deprive him of his opportunity to be involved with the children.

Having said that, the Court does not mean to minimize the history of physical abuse that plagued the family, and there is clearly evidence from which one could conclude that the possibility of harm to E.V. exists.  Mr. Vujicevic abused his wife, verbally and physically, over two decades,[2] and Dr. Gibson testified that where there is domestic violence in the home, children are at a higher risk of being abused themselves.  In the eight months before his family left, Mr. Vujicevic plainly showed that he is willing to strike not only his wife, but his children.  Dr. Gibson believes that, even if Mr. Vujicevic managed to contain his physically violent tendencies, the yelling and criticizing were upsetting to E.V. and put him at risk of certain psychological problems, including anxiety, depression, and anger that could lead to substance abuse or delinquency.  Nevertheless, the Court finds that E.V. could return to Croatia under circumstances that would minimize the potential of harm, either physical or psychological.  Because the mere possibility of harm does not establish an Article 13(b) defense to an action for the return of a child, the Court finds that the grave risk exception does not apply.

**B. MATURE CHILD EXCEPTION**

By its terms, the Convention does not apply to children who have reached the age of sixteen, and the drafters left it to the reviewing courts to determine whether the wishes of

---

[2]  The Court is convinced that Ms. Vargas would be in grave danger of physical harm if she were to return to Croatia and attempt to work cooperatively with Mr. Vujicevic, but that is not the issue here.

MEMORANDUM OF DECISION                    -6-

1   younger children should be given effect.  See Elisa Perez-Vera, Explanatory Report of the 1980

2   Hague Child Abduction Convention, Translation of the Permanent Bureau, www.hcch.net/index

3   _en.php?act= publications.details&pid=2779, ¶ 30 (1982) (noting that "all efforts to agree on a

4   minimum age at which the views of the child could be taken into account failed, since all the

5   ages seemed artificial, even arbitrary.  It seemed best to leave the application of this clause to the

6   discretion of the competent authorities.").  "Whether a child is mature enough to have its views

7   considered is a factual finding that a district court must make in light of the specific

8   circumstances of each case."  Haimdas v. Haimdas, 720 F. Supp.2d 183, 205 (E.D.N.Y. 2010)

9   (internal quotation marks and citation omitted).  For the reasons set forth below, respondent has

10  established that E.V. objects to being returned to Croatia and has reached an age and degree of

11  maturity at which it is appropriate to take account of his views.

12          E.V., at fourteen, has attained an age at which courts often take into consideration

13  the child's wishes.  See, e.g., Vasconcelos v. Batista, No. 11-41204, 2013 WL 600200 (5th Cir.

14  Feb. 15, 2013); de Silva v. Pitts, 481 F.3d 1279, 1287-88 (10th Cir. 2007); Laguna v. Avila, No.

15  07-CV-5136(ENV), 2008 WL 1986253, at *9-11 (E.D.N.Y. May 7, 2008); McManus v.

16  McManus, 354 F. Supp.2d 62, 71 (D. Mass. 2005).  In addition, he is mature beyond his fourteen

17  years based on both the manner in which he conducts himself and the substance of his

18  statements.  During the proceedings in this matter, the Court conducted an in camera interview

19  of E.V. and allowed counsel an opportunity to follow up with additional questions.  The Court

20  also heard testimony from a clinical psychologist, Katherine Gibson, who evaluated E.V. and a

21  math teacher, Christopher Bates, who has taught E.V. for over a year.  Mr. Bates described E.V.

22  as more mature than his classmates and age group, both with respect to how he relates to his

23  peers and how he relates to his teacher.  Dr. Gibson agreed that E.V. was above average in

24  maturity for a child of his age based on both written assessments and an interview she

25  conducted.  The undersigned's interview with E.V. revealed an intelligent, calm, focused, and

26  well-spoken fourteen year old.  He listened to the questions asked and responded thoughtfully

MEMORANDUM OF DECISION                          -7-

1  and appropriately.  When he disagreed with a position taken or an assumption made by the
2  undersigned or counsel, he was not shy about voicing his opinions and did so respectfully and
3  forthrightly.[3]

4      Petitioner argues that E.V.'s unwillingness to reinitiate contact with his father is a
5  sign of immaturity.  While it is true that E.V. may not fully grasp the repercussions of
6  completely cutting his father out of his life at this point in time, prescience is not required in
7  order to be considered mature.  The extent and focus of E.V.'s anger are rational, and the means
8  by which he hopes to avoid the conflicts that he found so troubling, namely by staying away
9  from his father, is logical even if there may be unintended consequences in the future.

10     Petitioner, citing Giampaolo v. Erneta, 390 F. Supp.2d 1269 (N.D. Ga. 2004), also
11 argues that, regardless of his age or maturity, the views espoused by E.V. regarding his desire to
12 stay in the United States should be disregarded because they are not his own.  Relying on the
13 bare circumstances of this case, petitioner argues that E.V.'s mother and brother have unduly
14 influenced his views.  There can be no doubt that E.V. has internalized the conflicts of his
15 childhood and that he is aware of his mother's and brother's opinions in this matter.  While the
16 circumstances of his life obviously influence the way he views the world, such influence is not
17 undue or otherwise suspect.  Unlike the ten-year old child at issue in Giampaolo, E.V. is fourteen
18 years old, is clearly capable of distinguishing between his own interests and desires and those of
19 his mother and brother, and has firm and full memories of his father and Croatia that he can
20 compare with his current situation.  In addition, all of E.V.'s answers rang true during the *in*
21 *camera* interview.  There was no evidence of improper coaching or any indication that E.V. does

22
23
24 _____

25     [3] Even petitioner's expert, Dr. Solchaney, who did not speak to any member of the family, said
26 that E.V. sounds like a "resilient, balanced, and focused" child in all areas except with regards to his
   desire to not have a relationship with his father.  This point is discussed more fully in the text.

MEMORANDUM OF DECISION            -8-

1   not firmly believe the views he espoused during the interview.[4]  Dr. Gibson reports that, in her

2   April 2013 assessment of E.V., he also told her that he does not want to return to Croatia.  In her

3   professional opinion, E.V.'s desire was not the result of coaching from others and did not merely

4   echo the sentiments or words of his mother or brother.  Having had the pleasure of meeting E.V.

5   and finding no reason to believe that he was parroting views that are not his own, the Court finds

6   that the sentiments E.V. expressed during the interview and his assessment are his and his alone.

7           Finally, petitioner argues that the Court should disregard E.V.'s mature objection

8   to return because it would contravene the purposes of the Convention if respondent were allowed

9   to benefit from the delay she intentionally caused in bringing this case to hearing and the

10  purposeful creation of factors that go against return, such as E.V.'s advancing age and his

11  successful adjustment to life in Seattle.  The Court acknowledges that at least one other court has

12  adopted this line of reasoning, finding that where the passage of time gave rise to the child's

13  desire to remain, the court would not reward the violating parent by refusing to order return.

14  Yang v. Tsui, 499 F.3d 259, 280 (3rd Cir. 2007).[5]  To the extent the Third Circuit would require a

15  district court to ignore the wishes of a child of appropriate age and maturity simply because

16  those wishes arose out of the wrongful removal and retention, the Court declines to adopt such

17  an analysis.  The purpose of the mature child exception is to give voice to a child who has

18  attained a certain age and maturity, even if those wishes run counter to the lofty public policy

19  purposes for which the Convention was adopted.  The drafters specifically provided that the

20  initial presumption that a wrongfully-removed child will be returned can be overcome based on a

21

22  _____

23      [4] Although petitioner's counsel and the Court both noted that E.V. used a phrase to describe his
    father that sounded rehearsed, it is reasonable to assume that a thoughtful child like E.V. has spent days,
24  if not weeks, pondering what he would say about his father in the context of this proceeding.

25      [5] The district court had also made a finding that the ten year old child at issue "was not of
    sufficient age or maturity for her views to be appropriately considered," a finding which the Third
26  Circuit affirmed.  499 F.3d at 279.

MEMORANDUM OF DECISION              -9-

mature child's objections despite the countervailing public policies that underlie the Convention.

Having heard all the testimony, interviewed E.V. *in camera*, and considered the actions of the parties, the Court declines to reject the honest and firmly-held wishes of a mature child of fourteen simply because the abducting parent delayed petitioner's ability to seek return while making every effort to ease the child's transition to the United States.

The Court recognizes the difficulties Mr. Vujicevic has had in initiating and prosecuting this action from afar.  Mr. Vujicevic was denied a visa by the United States and was therefore unable to attend trial, providing his testimony via telephone through an interpreter. Petitioner's counsel, Luka Misetic, did an outstanding job representing Mr. Vujicevic's interests in this matter, but it was undoubtedly frustrating having to fight this battle vicariously.  The Court has no doubt that Mr. Vujicevic loves E.V. and wants to do right by him going forward. Nevertheless, for all of the reasons stated above, the petition for return of E.V. to Croatia is DENIED.

Dated this 11th day of June, 2013.

*Robert S Lasnik*
Robert S. Lasnik
United States District Judge